Good morning, Your Honors. Renee Manis again with the Federal Public. Are you related to Hugh Manis? No, Your Honor. And, actually, we've had this conversation before. I practiced for quite a while in Maria Stratton's office and met Hugh Manis several times. Oh. And everyone noted, given Hugh Manis is a very well-known civil rights attorney in the Los Angeles area. And so we sat and I said, I don't know you, but everyone asked me, are we related? And we traced our family histories back a few generations. And really couldn't find anything. But — Well, his parents named him Hugh, so it's like, you know, Hugh Manis. Anyway — I would like to reserve a minute and a half. He never gives up the ship. No, he does not. He's an excellent attorney. Mr. Anderson is the appellant in this matter. Mr. Anderson is an exceptionally mentally ill young man who has spent most of his life either in mental hospitals or in jails. At the point in time of his behavior in this matter, he was sitting in the Oregon State Prison. He had recently escaped from the Oregon State Hospital. When we say escaped, the Oregon State Hospital is not that secure of a facility. He cut through a fence and walked away. It wasn't a big escape. But he had been at the Oregon State Hospital for almost five years. He was captured the next day, taken to the Oregon State Prison where he was sitting in isolation, and not — no longer medicated. He takes a number of antipsychotic, antidepressant medications. He believed, rightly or wrongly, that his life was being threatened and somebody was going to kill him. He also believed that his best way of saving himself was to get himself into Federal custody. And many inmates know that if they threaten the life of the President of the United States, they will be taken into Federal custody. Mr. Anderson first wrote to the Oregon State Prison officials themselves saying that he was part of a plot to kill the President. That engendered no response. So he then actually wrote through the U.S. Mail to the Oregon State Police saying that he was part of a plot to kill the President. Unfortunately, that also engendered no response. So Mr. Anderson wrote to other individuals saying he was part of a plot to kill the President. The primary guideline dispute at the time of sentencing, while there are others, I will focus primarily on whether this should have been considered one non-serious threat or multiple threats. Our analysis is what occurred here is Mr. Anderson had one intent and one purpose. He did not seriously was not seriously involved in a plot to kill the President. There were no other individuals. That was not his purpose. His purpose was to be taken out of Oregon State Prison and into Federal custody so his life would no longer be endangered. Unfortunately, it took him five letters for the Secret Service to come down and actually interview him, at which point in time he immediately stopped writing until six weeks later when he wrote off to Mark O. Hatfield, who is a well-known – a senator, a public servant in Oregon of longstanding who recently died. But Mr. Anderson, of course, is mentally ill and did not know that there was no Mark O. Hatfield at the Federal courthouse. So he wrote off to Mark O. Hatfield, reiterating that he was part of a plot to kill the President and asking if they were actually going to charge him. That was what Mr. Anderson's sole purpose was. I am aware, and the primary case which we cite is, of course, the Sanders case, which interpreted a prior guideline when discussing the fact that what you do when you look at the writings of this nature, because as the commentary to the guideline notes, this is a crime often committed by the mentally ill. The guidelines really cannot encompass all of the factors. So as the Sanders decision noted, it's important to look at the purpose, the intent, the entire record of what is going on, and making a determination of whether this is a non-serious or a single incident of a non-serious threat, or whether this is, in fact, multiple threats. It's a — it's someone who actually is out there threatening to kill the President with that type of intent. While Sanders interpreted a prior guideline, this Court recently had the Bagtasarian case, which we also cite, which again noted that when what we are punishing is speech, we really shouldn't just try to mechanistically start counting up words and punishing speech and extending our criminal law to reach that. We still need to look at the totality of the circumstances. In Bagtasarian, which was also prosecuted as a threat to kill the President, the statement was something along the line of he will have a bullet in his head. This Court determined that's not actually a threat. That's a statement of fact. It — he's not saying I will put the bullet in his head. He's just saying there will be a bullet in — in, of course, racially epitaphed because, unfortunately, as Mr. Bagtasarian and Mr. Anderson are wont to do, and other mentally ill individuals do, they sometimes utilize a great deal of verbiage that will get them attention. Mr. Anderson, in particular, escalated, and the government spends a great deal of time in their brief noting the type of rhetoric utilized. And it was, of course, unpleasant. He's a mentally ill individual, and he had not garnered sufficient attention. As soon as he obtained the attention of the Secret Service, he stopped making any threat whatsoever. His intent was simply that. If Mr. Anderson had, at the Oregon State Prison, access to a Xerox machine, he could have written one letter and just mailed it every week until someone came down to see him. And I think we would understand that if it's just one letter mailed every week until someone comes down to see him, that's one threat. And it was clearly nonserious. Even the Secret Service, who wrote the report for the government, noted that this is a manipulative intent to get out of State custody. Mr. Anderson's reason for his manipulative intent was that he believed his life was in danger. And because we contend that this was only a single, nonserious threat, that is a six-point change in the guideline range. You actually go from 12, which is the base offense level, which was added because it was adjusted upward because there was more than one threat. If it's a single, nonserious threat, it gets adjusted downward all the way to an 8. At that point, Mr. Anderson's sentence should have been in the range of 15 to 21 months. Instead, the government has, in the Court, sentenced Mr. Anderson to four years in Federal prison, basically because he wrote nasty letters, because he believed his life was in danger in the prison. If Your Honors don't have any other questions, I don't have anything else I wish to touch on at this point in time, and I'll reserve the remainder of my time for rebuttal. Did you ever read the case of Roy v. — or U.S. v. Roy? I'm sorry? Huh? U.S. v. Roy? I'm not sure I'm familiar with that one, Your Honor. It sounds vaguely familiar, but I can't, off the top of my head. Well — Was it in your brief? It was decided August the 22nd, 1969. It's my first published Ninth Circuit case when I was a district judge. Then I will definitely go read it, Your Honor. Yeah, and I'll autograph it, too, if you want. Thank you very much. May it please the Court, Stephen Pfeiffer for the United States. Did you read the Roy case? This would be a great time to be able to say yes. What did you say? I said it would be a good time to say yes, if he possibly could. Oh, yes. Oh. Just don't ask me what it says. You're not under oath. Well, anyway, I was sat on a panel with Barnes and Dunaway, and I remember it because when Senate Bill 1 was drafted, my committee, headed by Pat Brown, our former governor of California, when it came to threatening the life of the president, the proposed statute on that subject was taken apart from this case. It never got passed, though. Thank you. May it please the Court. In 1997, the U.S. Sentencing Commission amended the applicable guideline in this case to increase the exposure, the offense level, for the number of threats, the number of communications. And that has been interpreted by three other circuits, the Seventh Circuit in the Scott case, to mean to interpret threat as communications. All those cases involved very similar substantive threats that were communicated over a period of time in different ways to different people in some cases so that they were essentially repeated, but the communication was the essential element in determining whether it was a separate threat. And the Fraser case in particular, which refers to this Court's opinion in Sanders and basically says it's now obsolete after the Sentencing Commission amended the provision, the Fraser case points out that the essence is whether each of those threats could be separately prosecutable. Now, in this case, we picked one particular threat, the one in which the defendant sent a letter to the parents of someone he had communicated with over the Internet in Utah and sent it to them. There were other threats, two threats that were sent, one which he tried to send and was intercepted, and one in which he succeeded in sending to an individual in Idaho, a woman who was the very one who gave him, provided him the bolt cutters that permitted him to escape from the secure unit of the Oregon State Hospital. And then there were, there was another threat in which, which ended up in the U.S. Attorney's Office, and that was also counted as the fourth threat. And so there were four altogether found by Judge Brown to be communications, to be threats, even though the intent was the same, it was simply repeated over a period of time. And I wanted to correct you. Scalia. How did she get those bolt cutters in? Gannon. Pardon me? Scalia. How did she get those bolt cutters in? I'm not sure exactly, but she was able to sneak them in with the help of an insider, my understanding is. Now, I wasn't part of that case. Gannon. I thought it came in some electronic item. Yes, exactly. Gannon. But bolt cutters are pretty big, you know. Right. Well, this was a chain-link fence. It didn't require the huge type of bolt cutters necessarily, but anyway, and that's important that this man was on escape, I'm sorry. It was a wire cutter. It's similar to that. I'm not sure what they look like. Or a Bangalore torpedo. Right. He's been convicted of that escape now. That occurred after he was sentenced in this case. Anyway, it's important in this case that he was on escape status for at least 24 to 48 hours in Utah, and he makes the claim in these letters that he met with a group of individuals, five individuals who were dedicated to killing the President, and that if they didn't succeed, he would do it when he got out. These are serious threats. They meet the Bagdasarian test of both objectively and subjectively as threats. He certainly intended them to be perceived as threats, and anybody objectively looking at the letters would perceive them and conclude that they were true threats against the life of the President. Now, counsel said something I do want to correct. When the Secret Service talked to him about two weeks after the interception of the kites, the communications within the State Penitentiary, when they went down to Salem to talk to him, they knew nothing about the letters that had actually gone out to individuals outside of the institutions, the ones in Idaho and Utah and in another letter in California. They didn't know about that. And the defendant didn't mention it to him. He clammed up and said, you know, just read the letters when it came. But he did say he wanted to see the President dead. So they didn't know about that at the time they were speaking with him. At the time, they knew he was secure. He was in the State Penitentiary. He couldn't harm the President. And they decided to interview him about this, the communications he'd had within the institution. So the case was much more aggravated after they received information from the parents of the woman in Utah that they had received this letter, very alarming to them. I mean, they considered it to be a very serious threat against the President because they turned it over to authorities. This involved a four-state investigation by the Secret Service. They went out and interviewed people in all four locations, took it very seriously. And this country has a history, unfortunately, of presidential assassinations and attempted assassinations by mentally disturbed individuals. That's generally the – those are generally the people who try to kill the President and in some cases succeed. And in this case, the defendant is mentally ill, but he's also been diagnosed as having a psychopathic personality. That was done at the request of the defense when they asked that he be examined by the Bureau of Prisons. And their own expert, Dr. Grounds, agreed that, yes, he has mental illness, but he's also a psychopath. He has a history of psychopathic activity, and in her – in the opinion of the experts who examined him, they predicted that he could very well act violently against people in the future. So Judge Brown had a whole array of information and very in-depth study of this individual. There were literally hundreds of pages of reports and documents over the years documenting this man's mental illness, as well as his antisocial personality and his psychopathic personality. So 48 months is a reasonable sentence, a very reasonable sentence, given all the circumstances of this case. If the Court has no other questions, I'll sit down. Thank you. Breyer. 48 months? 48 months. Consecutive to what he was already serving, so that he doesn't essentially get rewarded for doing this, because if there was an argument that perhaps it could be concurrent, but the Court made it consecutive considering that he was already serving a State sentence when he committed this offense. Thank you. Sotomayor. Just a couple of brief points, Your Honors. We do agree that the Sanders case is, of course, predating the Guideline change. We understand that the other circuits have reached one conclusion. We think that issue is joined for this panel and have analyzed the issues under Bagdasarian in the briefs. In terms of why it took the Secret Service so long to figure out that Mr. Anderson was mailing these letters, I do not know. If you look at the Government Supplemental Excerpts of Record, you will see very clearly, starting on page 1, that his first communication was to the Oregon State prison. He wanted officials to know. His next communication, if you go to Government Supplemental Excerpts of Record 7, is to the Oregon State police. He even writes in really big letters, very important if you care. He didn't want to have to write to other individuals to have them find out. He wrote directly to the police. That is why we believe that in reality, what the evidence shows in this situation is it was one threat repeated until he gained attention. It was not intentionally sent to others until he was not getting response from the State prison or the State police. And we've made the additional arguments in the brief. I have nothing further to say unless Your Honors have any questions. Thank you. Thank you, Your Honors. This matter is also submitted.
judges: Goodwin, Pregerson, Christen